[Crim. No. 1985. Fifth Dist., Dec. 16, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK NEIL CAMERON, Defendant and Appellant.

**COUNSEL**

William J. Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Charles P. Just and W. Scott Thorpe, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THOMPSON, J.\***—Defendant herein was convicted by a jury of violation of section 273d of the Penal Code (infliction by a husband of corporal injury upon his wife). Defendant admitted a prior conviction of receiving stolen property (Pen. Code, § 496). Defendant was sentenced to state prison. He appeals.

The domestic situation from which this criminal charge arose is unremarkable. Defendant Jack Cameron and his wife Joyce, a bride of one month, were participating in a social affair with another couple who were having dinner with them at the Cameron apartment. Shortly after midnight Jack and Joyce offered to drive their friends, the Walkers, back to their motel. On the way defendant stopped his car and was unable to start it. Joyce and her friends decided to take a taxi home while Jack remained with his vehicle to repair it.

Joyce went to bed and fell asleep. At about 2 a.m. she was awakened by her husband who had seized her by a breast and was twisting it. Jack told Joyce that he intended to hurt her and thereupon slapped and kicked her and threw her off the bed. He told Joyce that he had once knocked a woman's teeth out because she talked too much and since she (Joyce) did not listen he was going to have to "fix" her ears so she would never hear again. Defendant continued to strike and shake Joyce and kicked her after he had jerked her off the bed onto the floor. In the course of the melee Joyce's nose was broken, her left ear was cut requiring considerable surgical intervention. Her face and body bore marks of trauma.

The affray concluded by defendant's forcibly dragging his wife into the bathroom and placing her under the shower after having torn off her nightgown.

Joyce's 11-year-old daughter, who had been awakened by the commotion, ran next door to get help for her mother. The authorities were called and defendant was arrested.

Defendant at all times contended that he had slapped his wife only once and the remainder of the injuries had been caused by her falling against a sewing machine.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

There was testimony that both husband and wife had been drinking but the arresting officers concluded that neither was intoxicated.

Defendant urges a number of errors assertedly committed during the course of the trial. None of these procedural errors is of sufficient merit to warrant any extended discussion. For example, his first claim of error is that the prosecutor was guilty of prejudicial misconduct during his closing argument. We do not reach the question as to whether the failure to object to such alleged misconduct constitutes a waiver for the reason that the so-called misconduct did not in fact occur. The prosecutor's argument at all times related to the evidence. To illustrate, one claimed instance of misconduct is the following statement made by the prosecutor in his closing argument: "If you believe Mrs. Cameron and all the evidence supports her story, you are not going to find that she was just merely unlawfully touched by somebody, you are going to find that the person is a wife beater. I think that's what the case is all about, ladies and gentlemen."

The prosecutor's comment above quoted was clearly permissible. The other asserted errors are of no more merit. In not a single instance did the prosecutor indicate that his opinions were based upon anything other than the evidence which the jury had heard. ■ Broad discretion is vested in the trial court to permit arguments by counsel that are based upon counsel's view of the evidence and that discretion was not abused here. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913].)

■ Another procedural error asserted by defendant is that he was denied effective assistance of counsel because his counsel did not raise the issue as to the constitutionality of section 273d of the Penal Code and that therefore he is barred from raising the issue on appeal. The argument is fallacious. Since the constitutionality of a statute goes to the jurisdiction of the court it is an issue which may be raised on appeal and appellate counsel has properly raised it. It is an issue which goes to the heart of this appeal and we shall discuss it at length.

■ Defendant also asserts that the trial court improperly excluded relevant evidence, the relevant evidence being that the victim in this case had been assaulted by a prior spouse who had also broken her nose. ■ There is no possible relevance to testimony as to prior assaults upon a victim unless it can be shown that the victim was the aggressor. ■ Although defendant made a feeble attempt to show

that his victim was the aggressor in this instance, he made no offer of proof that in her prior encounter with her former husband Joyce had initiated the fight. It was apparently defendant's theory that he should be permitted to show that, since Joyce's nose had been broken previously, less force would be required to break it a second time. The trial court properly applied the principle that a wrongdoer in criminal cases as in civil torts takes his victim as he finds him.

Defendant's chief reliance for a reversal is his assertion that Penal Code section 273d is unconstitutional.[1] He makes a threefold argument in support of his contention: (1) that said section 273d denies a defendant equal protection of the law in that it applies only to married men who assault their wives and not to unmarried men who assault their paramours nor to wives who assault their husbands; (2) that the definition of the crime in Penal Code section 273d is impermissibly vague; and (3) that the punishment provided for the crime is cruel and unusual.

Dr. Samuel Johnson once observed that "nature has given woman so many advantages the law ought to give her no more." This doubtful premise has been given new life for in recent times we have observed many legislative and administrative attempts to asexualize many economic and social regulations which have heretofore established separate considerations based on sex, some initially intended to protect women in physical or moral situations. For example, we have witnessed the enactment of certain laws barring women from work either upon the basis that it was too arduous for the "weaker" sex or was "unladylike." In striking down such laws many ancient concepts of the role of women in society have been examined and found wanting. The Federal Civil Rights Act of 1964 and the rules and regulations of the Equal Employment Opportunity Commission reject the old stereotypes of what is deemed a proper consideration in determining whether a particular employment is suitable for women. Such cases as *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351] have defused the notion that the protection of women's morals furnishes an adequate guideline for discrimination in employment. The case of *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, also makes it clear that any

---

[1]Penal Code section 273d reads as follows: "Any husband who willfully inflicts upon his wife corporal injury resulting in a traumatic condition, and any person who willfully inflicts upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for not more than 10 years or in the county jail for not more than one year.

classification based solely upon sex is suspect, the more so in the area of morals or muscles.

However, in the instant case we are not confronted with discrimination relative to employment or morality. We are rather concerned with one of the most troublesome and yet most fundamental relationships in our social structure, marriage, and while, of course, one marriage partner is of necessity a female, the more fundamental consideration is that she is a wife and oftentimes a mother. The voluminous laws relating to such matters arising out of the marital relationship such as property rights, child custody, etc., demonstrate the vital interest of the state in marriage relationships. The observable effect of broken homes upon juvenile delinquency emphasizes society's concern with the preservation of marriage.

Justice Douglas observed in *Skinner v. Oklahoma,* 316 U.S. 535 at page 540 [86 L.Ed. 1655 at page 1660, 62 S.Ct. 1110]: "[A] State is not constrained in the exercise of its police power to ignore experience which marks a class of offenders or a family of offenses for special treatment. Nor is it prevented by the equal protection clause from confining 'its restrictions to those classes of cases where the need is deemed to be clearest.' "

In the case of *Sail'er Inn, Inc. v. Kirby, supra,* 5 Cal.3d 1, the following statement appears at page 21: "Where the evil which the Legislature seeks to prevent can be directly prevented through nondiscriminatory legislation, and where the class singled out by the Legislature has no necessary connection with the evil to be prevented, the statute must be struck down as an invidious discrimination against that class."

We think the conclusion inescapable that wives as an object of abuse by their spouses are a class distinctly set apart by the conditions under which their abuse customarily occurs. The first and most obvious distinction is that women are physically less able to defend themselves against their husbands than vice versa. National statistics show that the average adult male is 28 pounds heavier and 5 inches taller than the average adult female.[2] No competent prize fight manager would send a much smaller combatant into the ring against a much larger opponent,

---

[2]Statistical information taken from: Weight, Height, and Selected Body Dimensions of Adults, United States, 1960—1962, Vital and Health Statistics; Series 11, Number 8; U.S. Department of Health, Education, and Welfare.

especially to face such opponent without the benefit of a referee or the restraining influence of an audience.

It is indisputable that the overwhelming number of encounters between husbands and wives take place in the home, usually late at night and after the consumption of alcohol by one or both of the parties. Except in cases of rape or other serious felonies the male does not ordinarily attack a female not his wife. Society places strong restraints upon unchivalrous conduct by a male toward the female in a social setting. But such chivalry appears to lose its efficacy at the threshold, especially if the husband comes home filled with the tension of his work and often a few beers and confronts a vituperative wife. Given this milieu physical confrontation is not unpredictable and quite predictable is the outcome, that the husband's fists are more damaging than the wife's tongue, however sharp.

The argument is made that no special legislation is needed to protect wives inasmuch as an assaultive husband can be charged under Penal Code section 245, subdivision (a), with assault by force and means likely to produce great bodily injury if the severity of the injury warrants such a charge, or otherwise with assault and battery.

Such an argument loses much of its persuasive effect when we consider the realities of the situation. When a husband assaults his wife it is usually late at night and frequently out of the presence of witnesses except, as in this case, in front of a helpless and disturbed child. The officer responding to the call for help, as in this case, must determine whether a felony or a misdemeanor has been committed. If he determines that a misdemeanor has been committed he is powerless to effect an arrest, inasmuch as it was not committed in his presence, unless the wife makes a citizen's arrest, a most unlikely course of action. He must therefore leave the wife in the home wherein the beating took place. The wife's options are not very satisfactory. She is almost forced to remain at home since her opportunities to flee are usually severely limited. The husband may have the car; there may be children in the home to be considered; and the unaccompanied female at night is greeted with suspicion if not refusal of admission by hotel and motel clerks who fear not only her possible profession but if convinced of her true plight are fearful of her being followed by a vengeful husband who would create a scene.

Another factor we believe worthy of consideration is that, unlike most assaults charged under Penal Code section 245, subdivision (a), a wife beating is usually accomplished with fists and kicking as in this case. The severity of the injuries are therefore not always capable of instant diagnosis. Internal injuries and even broken limbs may not immediately evidence themselves. Except for the provisions of Penal Code section 273d an officer responding to a wife beating case would ordinarily, in the exercise of caution and to avoid a charge of false arrest, only arrest the husband under the provisions of Penal Code section 245, subdivision (a) in extreme cases. Even the infliction upon a wife of considerable traumatic injury would tend to be treated by the arresting officer as a misdemeanor which would produce the consequences of the wife's being left in the home to face possible further aggression. But an officer given the alternative of arresting for a felony under the provisions of section 273d may do so when he observes traumatic injury. The skepticism in general with which domestic embroglios are viewed tends to insure that an arresting officer will not abuse his power.

What we have heretofore said as to the seriousness of the problem is reinforced by the overriding interest of the state in preserving the institution of marriage and particularly so when children are involved. The state has a greater interest in deterring crimes which disrupt the marriage relationship than in other classes of crime. While we realize that the deterrent effect of any particularly prescribed punishment is difficult to evaluate it is a rational assumption that at least some men may be restrained from inflicting injury upon their wives if such conduct may lead to a felony conviction. It may also be inferrable that some wives (a declining number) may submit to some corporal abuse by their husbands without seeking police intervention, but are unwilling to accept the infliction of trauma. A reminder to their husbands that the law does not only not tolerate the infliction of wife beatings but may in fact impose prison terms therefore may not only deter such conduct but may thereby preserve the marriage by curbing the male aggressiveness. While this cause and effect relationship may be imprecise the law does not, and cannot, require an irrefutable cause and effect relationship between crime and punishment.

Admittedly the number of laws in civil and criminal fields in this state, in other states, and in federal jurisdictions in which sex is a significant factor is diminishing. But in each instance wherein a law which makes a distinction between males and females has been held constitutional some rational basis has been found to exist for the discrimination practiced.

For example, selective service laws requiring military service of males only has met the constitutional challenge. (*United States* v. *Cook* (W.D.Pa. 1970) 311 F.Supp. 618, 622.)

A statute of the State of Maine providing harsher penalties for male escapees than female escapees upon the basis that the escaping male was more likely to commit dangerously aggressive acts than the female was upheld and certiorari denied by the United States Supreme Court. (*Wark* v. *State* (Me. 1970) 266 A.2d 62.)

The argument is made that Penal Code section 273d is impermissibly uninclusive because it does not provide greater punishment for a wife who beats her husband than is true of the reverse.

In the case of *In re Ricky H.* (1970) 2 Cal.3d 513 at page 522 [86 Cal.Rptr. 76, 468 P.2d 204], the California Supreme Court said: "Although statutes which affect a particular class must be based upon rational distinctions or classifications (*Rinaldi* v. *Yeager,* 384 U.S. 305, 308-309 . . . there is no constitutional requirement of uniform treatment (*Bilyeu* v. *State Emp. Retirement System,* 58 Cal.2d 618, 623 . . .). Class legislation is not arbitrary if it is based upon some difference or distinction having a substantial relation to the purpose of the statute. (*Professional Fire Fighters, Inc.* v. *City of Los Angeles,* 60 Cal.2d 276, 288 . . . .)"

The court in *In re Ricky H., supra,* 2 Cal.3d 513 at page 521, also made the following statement which appears to be particularly pertinent to our discussion: "Petitioner points out that presently there exist no statutory provisions imposing upon indigent adults, or their parents, any obligation to reimburse the county for the cost of appointed counsel in criminal proceedings. However, the fact that the Legislature has not acted in other areas is not necessarily dispositive, for 'The Legislature is not bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident.' " (*Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833 [48 Cal.Rptr. 481, 409 P.2d 481].)

Similarly the United States Supreme Court observed in *Dandridge* v. *Williams* (1970) 397 U.S. 471 at pages 486-487 [25 L.Ed.2d 491 at page 503, 90 S.Ct. 1153]: "[T]he Equal Protection clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all."

The case which appears to be most decisive on the precise point here involved is *Russell* v. *Carleson* (1973) 36 Cal.App.3d 334 [111 Cal.Rptr. 497] (Hg. den. by the Supreme Court April 17, 1974.) In *Russell* v. *Carleson, supra*, 36 Cal.App.3d 334, we have a case factually similar to our own. In that case a constitutional attack was made upon a provision in the Welfare and Institutions Code (§ 11351.5) which requires that an unrelated adult male living with a family receiving or applying for aid to dependent children "shall be required to make a financial contribution to the family which shall not be less than it would cost him to provide himself with an independent living arrangement."

The contention was there made that the above provision was discriminatory in that not only did it require contributions only from unrelated males living with AFDC mothers and not related males, but it did not require any contributions from unrelated adult females living with the heads of AFDC families. The court stated in *Russell* v. *Carleson, supra*, at pages 343-344: "Directing our attention to the constitutional guarantee of equal protection of the laws, we observe that the latter guarantee 'compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) '[T]he Legislature is vested with wide discretion in making the classification and . . . its decision as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. [Citations.] . . . Only invidious discrimination offends the equal protection clause [citation]; the Legislature need not treat similar evils identically or legislate as to all phases of a field at once [citation]; legislative classification is permissible when it is based upon some distinction reasonably justifying differentiation in treatment [citations]; a classification is not void because it does not embrace within it every other class which might be included [citation] . . . .' (*People* v. *Aguiar, supra*, 257 Cal.App.2d at p. 604.) ' "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [Citation.]' (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 [25 L.Ed.2d 491, 502, 90 S.Ct. 1153].) (See also *Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 527-528 [3 L.Ed.2d 480, 485-486, 79 S.Ct. 437]; *In re Ricky H., supra*, 2 Cal.3d at p. 522.)

"Similarly, the California Supreme Court has declared: 'The Legislature is not bound, in order to adopt a constitutionally valid statute, to

extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident.' (*Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833 [48 Cal.Rptr. 481, 409 P.2d 481].) 'In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' (*Dandridge* v. *Williams, supra,* 397 U.S. at p. 485 [25 L.Ed.2d at p. 501].) '[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all.' (*Id.* at pp. 486-487 [25 L.Ed.2d at p. 503].) 'A legislature may address a problem "one step at a time," or even "select one phase of one field and apply a remedy there, neglecting the others." [Citation.] So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them'. (*Jefferson* v. *Hackney* (1972) 406 U.S. 535, 546-547 [32 L.Ed.2d 285, 296, 92 S.Ct. 1724].)"

The court, while recognizing that the law was to a degree discriminatory, said at page 344: "The Legislature could justifiably have determined that there were more spouseless AFDC mothers than AFDC fathers, and that a greater threat of diversion of the grant was therefor posed by cohabiting UAMs [unrelated adult males] than by unrelated adult females or by adult relatives; hence plaintiffs' claimed denial of equal protection falls. The Legislature could properly have assigned a greater priority or urgency to UAM legislation than to comparable legislation in other areas. (Cf., *In re Ricky H., supra,* 2 Cal.3d at p. 522.)"

We think it abundantly apparent that percentagewise the number of wives who assault their husbands under the definition of such assault in section 273d of the Penal Code is far smaller than the number of AFDC families who have either adult unrelated females or related males living with them. The Attorney General cites us to statistics from the Staff Report submitted to the National Commission on the Causes and Prevention of Violence (Vol. 2, p. 301) which indicate that 273d type assaults committed by husbands upon wives as opposed to assaults committed by wives upon husbands approach the ratio of 15 to 1 (93.3 percent to 6.7 percent).

Surely the interest of the state is greater in preserving the marital state than in the monetary considerations in *Russell* v. *Carleson, supra,* 36 Cal.App.3d 334.

■ The argument that female paramours should be entitled to the same protection as a lawfully married wife is unpersuasive. The state has no interest in the maintenance of a meretricious relationship as is evidenced by the fact that although a putative spouse may have some equitable rights, she is not afforded the statutory rights granted a wife, i.e., community property, inheritance, etc.

In conclusion upon this point we do not wish to be understood as saying that section 273d could not with justification be made applicable to the reverse situation, namely assaults by wives upon husbands. In fact, with the modern trend of greater independence and assertiveness on the part of the female the Legislature perhaps would be well advised to give recognition to this fact. By making section 273d applicable to both spouses it might be expected that the state would be affording some additional protection to the marital state. We merely conclude that its failure to do so does not for the reasons we have advanced, vitiate the constitutionality of section 273d as it presently stands.

■ Defendant's argument that section 273d of the Penal Code is unconstitutionally vague may be quickly disposed of. The language complained of, namely, "corporal injury resulting in a traumatic condition" appears to pose no difficulty of interpretation. The language, particularly in the context of this case is crystal clear. Defendant was advised that he had wilfully inflicted injury to the body of plaintiff producing a traumatic condition, i.e., bruises, abrasions, a cut ear and a broken nose. The court was well able to define the offense for the jury. For example, he instructed that a "traumatic condition is an abnormal condition of the living body produced by violence."

The test set forth in *People* v. *Anderson* (1972) 29 Cal.App.3d 551, 561 [105 Cal.Rptr. 664], is squarely met. We quote: "If an accused can reasonably understand by the terms of the statute that his conduct is prohibited, the statute is not vague. [Citation.]"

■ Defendant's remaining contention that the punishment imposed by section 273d of the Penal Code constitutes cruel and unusual punishment has been fully answered by the recent case of *People* v. *Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001]. *Wingo* held in effect that

the Adult Authority must within a reasonable time fix the maximum in any given case, and if the Adult Authority either fails within a reasonable time to fix the maximum sentence or fixes an unreasonable term, defendant may seek relief by way of habeas corpus. Penal Code section 273d on its face permits a wide range of sentences, from one to ten years, to cover a wide range of behavior, and until the court is otherwise advised it is presumed that the Adult Authority will fix a term reasonably commensurate under the circumstances.

The judgment is affirmed.

Gargano, Acting P. J., and Ginsburg, J.,* concurred.

A petition for a rehearing was denied January 15, 1976. Ginsburg, J.,* was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied February 11, 1976. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Assigned by Chairman of the Judicial Council.