[L.A. No. 31617. Apr. 5, 1984.]

JANET VAESSEN et al., Plaintiffs and Respondents, v.
MARION J. WOODS, as Director, etc., et al.,
Defendants and Appellants.

[L.A. No. 31602. Apr. 5, 1984.]

JANET VAESSEN et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
MARION J. WOODS, as Director, etc., et al., Real Parties in Interest.

COUNSEL

George Deukmejian and John K. Van de Kamp, Attorneys General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman, James E.

Ryan and G. R. Overton, Deputy Attorneys General, for Defendants and Appellants and Real Parties in Interest.

Alan Rader, Marilyn Kaplan Katz, Stanley E. Doty and Eileen Matteucci for Plaintiffs and Respondents and Petitioners.

No appearance for Respondent Court.

## OPINION

REYNOSO, J.– At issue is whether defendant California Department of Social Services' policy of treating income tax refunds as income for purposes of reducing the amount of assistance paid to recipients of aid to families with dependent children (AFDC) comports with applicable state and federal laws governing administration of the AFDC program. As we explain, we find the policy is inconsistent with the provisions of the federal statutes and with the purposes of this program of public assistance. Under the controlling provisions such sporadically received monies can only reasonably be deemed resources which have no effect on the amount of a family's grant unless they combine with other existing resources to exceed the maximum allowed by statute.

The Director of the Department of Social Services (hereafter defendant) appeals from an order preliminarily enjoining the department from enforcing a regulation pertaining to payment of AFDC. (*Vaessen* v. *Woods,* L.A. 31617.) Plaintiffs, representing affected AFDC recipients throughout California, petition for mandamus to compel a further injunction of a similar regulation which was subsequently promulgated. (*Vaessen* v. *Superior Court,* L.A. 31602.) We ordered the cases consolidated in order to determine the validity of the policy embodied in both regulations. We affirm the judgment in L.A. 31617 and order issuance of the writ prayed for in L.A. 31602.

I

The named plaintiffs represent the class of California applicants for and recipients of AFDC whose benefits have been or will be reduced or denied due to their receipt of one or more income tax refunds for 1978 and subsequent tax years. They are recipients who have been employed long enough in a given year to accrue some withholdings, but who have not been long or profitably enough employed to attain self-sufficiency at a standard of

living above the minimum standard of need defined by Welfare and Institutions Code section 11452.

Janet Vaessen's plight is typical of the difficulties created by defendant's policy of treating tax refunds as income. Ms. Vaessen is the sole support of her son. In the spring of 1979 she planned to study for the state nursing board examination. Passage of the examination would be a significant step enabling her to enter a work force where she could eventually become fully self-supporting. In April she received an income tax refund of $81.20. She duly reported the receipt to her eligibility worker. She then spent the refund money to pay overdue bills, to purchase clothing and for transportation. Nevertheless, two months later her AFDC grant was reduced by the full $81.20, to a total sum of $206.[1] As a result, Ms. Vaessen had to borrow money simply to pay the family's rent of $225, and was without funds with which to pay for utilities, transportation, laundry and other essential items. Instead of studying, she had to look for some kind of work that would enable her to meet the family's immediate survival needs.

Plaintiff-in-intervention Carol Esquibel supports her two young children. Her August 1979 grant was reduced to $73 as a result of the receipt in June of $381 in state and federal tax refunds. By August, however, the tax refunds had long since been spent on automobile repairs and the purchase of shoes and clothing for the children. As a result Ms. Esquibel could not pay her rent. Her family suffered the extreme hardship and disruption of court proceedings which resulted in the family being scheduled for eviction by the sheriff at the end of August.

The other plaintiffs, named and unnamed, suffered similar hardships as they tried to eke out an existence even though the meager assistance provided to them was reduced or denied altogether because of the earlier receipt of tax refunds. Pursuant to Welfare and Institutions Code sections 11450 and 11452, California provides grants to needy families according to the size of the household. Currently, a family of two receives enough aid to bring its total monthly income to $408; a family of three is allotted $506, a family of four $601 and a family of ten or more may receive $1,071. As this court noted in *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730 [97 Cal.Rptr. 385, 488 P.2d 953], these standards are "*minimum* basic standards of adequate care" and "not necessarily reflective of actual need." (*Id.*, at p. 742, fn. 14; see also Welf. & Inst. Code, § 11452; *California*

---

[1] Under the system of "prior month budgeting" used by California throughout the period of this lawsuit, the amount of an AFDC payment is based upon an assessment of the need, income and resources of the recipient household in a "budget month" which is the second month prior to the "payment month." (See State Dept. Social Services, Eligibility and Assistance Standards Manual (hereafter EAS), 44-315.61.)

*Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445, 448-452 [93 Cal.Rptr. 758, 482 P.2d 670].) Thus, it is neither a surprise nor an indication of careless spending to find that recipient families must often utilize their tax refunds to meet current pressing needs and are unable to "save" the funds to meet the expenses of daily living two months later. The record shows that the department estimated that in the fiscal year 1976-1977 approximately 22,700 California AFDC recipients would receive federal income tax refunds and that the average amount would be approximately $131 per recipient. At oral argument plaintiffs explained that the number of families receiving tax refunds represents less than 5 percent of the total number of AFDC recipients, even though 60 percent of recipients work at some time during the year.

The original plaintiffs filed a complaint seeking mandamus (Code Civ. Proc., § 1085), declaratory and injunctive relief, and retroactive payment of AFDC benefits withheld pursuant to the department's policy of treating income tax refunds as income rather than as property resources. Defendants are the director, the department and the State of California. Plaintiffs claim that the department's policy violates the purposes of the AFDC program, the language of federal regulations—since deleted—which defined income as funds "actually available for current use on a regular basis" (45 C.F.R. § 233.90(a)(1) as promulgated in 1975), and this court's holding in *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730 [97 Cal.Rptr. 385, 488 P.2d 953], appeal dismissed (1972) 406 U.S. 913 [32 L.Ed.2d 112, 92 S.Ct. 1762].

On July 27, 1979, the Los Angeles Superior Court granted a preliminary injunction restraining defendants from denying AFDC benefits to the named plaintiffs pursuant to their policy regarding tax refunds. The parties later stipulated to an additional injunction covering the plaintiffs in intervention. On April 14, 1980, after the class had been certified, the court issued an injunction restraining defendants from reducing or denying benefits of all recipients of and applicants for AFDC in California on this basis. The order was made effective immediately, compelling payment of full benefits in the month of April 1980. Defendants appealed. (Code Civ. Proc., § 904.1, subd. (f).) Pending the appeal, however, they agreed to abide by the injunction and treat refunds from the 1980 tax year as resources when they were received in 1981. (*Vaessen* v. *Woods,* L.A. 31617.)

In response to the federal Omnibus Budget Reconciliation Act of 1981 (Pub. L. No. 97-35, hereafter the OBRA) the department promulgated new regulations which classify, inter alia, monies withheld from recipients' paychecks for state and federal income tax purposes, as income actually available upon receipt of the paychecks and require corresponding reductions in

grant payments. At the same time the department announced its intention to resume treating income tax refunds as income in the month received. Under these regulations excess withholdings would be considered as income to recipients twice: once when withheld and a second time when returned.

On April 23, 1982, plaintiffs sought another preliminary injunction ordering the department to release any benefits for April 1982 withheld as a result of its policy regarding refunds from the 1981 tax year. The Los Angeles Superior Court granted a temporary restraining order. After further briefing and argument, however, the court denied a preliminary injunction and dissolved the restraining order. Plaintiffs then sought a writ of mandate. (*Vaessen* v. *Superior Court,* L.A. 31602.)

The Court of Appeal summarily denied mandamus. On the same day it issued its published opinion reversing the original preliminary injunction. Pending final determination of L.A. 31602 we ordered the department to treat as resources instead of as income, all income tax refunds received at any time during which real parties in interest (defendants) were including income tax withholdings as income for AFDC purposes, and all refunds attributable to income tax withholdings that were included in income in determining the allowance or amount of AFDC benefits.

The practice of "double counting" was suspended by a decision of the United States District Court for the Northern District of California permanently enjoining the department from considering monies withheld for income tax purposes as income available to AFDC recipients. (*Turner* v. *Woods* (N.D.Cal. 1982) 559 F.Supp. 603 affd. (9th Cir. 1983) 707 F.2d 1109, cert. granted Feb. 27, 1984 *sub nom. Heckler* v. *Turner* — U.S. — [79 L.Ed.2d 739, 104 S.Ct. 1412]) Its validity is therefore not now considered.

## II

AFDC was established by the Social Security Act of 1935. (42 U.S.C. § 601 et seq.) It is jointly funded by the federal government and the states and is administered by the states in a scheme of "cooperative federalism." (*King* v. *Smith* (1967) 392 U.S. 309, 316 [20 L.Ed.2d 1118, 1125, 88 S.Ct. 2128].) While state participation is elective, federal funding is conditioned on program compliance with the Social Security Act (Act) and applicable federal regulations. (See 45 C.F.R. § 233.10 et seq.) California participates under the terms of Welfare and Institutions Code section 11200 et seq.

One of four categorical assistance programs established by the Act, AFDC provides financial assistance to families in which a dependent child is in need of financial support because of the absence, disability or unem-

ployment of a parent. (See 42 U.S.C. §§ 606(a), 607, 608; Welf. & Inst. Code, §§ 11250, 11251.)

Two major purposes of the program are recognized. From the outset AFDC has sought to provide for the financial needs of families with dependent children so that the children may remain in their home. (See, *Burns* v. *Alcala* (1975) 420 U.S. 575, 581 [43 L.Ed.2d 469, 476, 95 S.Ct. 1180]; *King* v. *Smith, supra,* 392 U.S. 309.) In conjunction with subsequent amendments which made families with an unemployed parent eligible for AFDC assistance (this criterion was established in 1961 and became a permanent feature of the program in 1967, see 1981 U.S. Code Cong. & Admin. News, p. 781), a purpose of encouraging caretaker relatives to achieve self-support through employment has also been emphasized. (See *Shea* v. *Vialpando* (1974) 416 U.S. 251, 253 [40 L.Ed.2d 120, 125, 94 S.Ct. 1746].)

■ The states have broad discretion to determine the minimum standards needed to maintain family life and to devise systems for determining financial eligibility and the amounts of assistance they will pay. (*Shea* v. *Vialpando, supra,* 416 U.S. 251, 253 [40 L.Ed.2d 120, 125]; *King* v. *Smith, supra,* 392 U.S. 309, 318 [20 L.Ed.2d 1118, 1126].) Other eligibility criteria, e.g., the definition of an absent parent or the class of eligible children, must be measured by federal standards. (*Carleson* v. *Remillard* (1972) 406 U.S. 598 [32 L.Ed.2d 352, 92 S.Ct. 1932]; *Townsend* v. *Swank* (1971) 404 U.S. 282 [30 L.Ed.2d 448, 92 S.Ct. 502].)

California has adopted a "flat grant" system in which the amount of payments made to eligible families is determined according to the number of eligible needy persons in the household. The monthly payment equals the maximum aid for the appropriate size family, less all nonexempt income of members of the household. (See Welf. & Inst. Code, § 11450; *Conover* v. *Hall* (1974) 11 Cal.3d 842 [114 Cal.Rptr. 642, 523 P.2d 682].) Because California uses a "prior month budgeting" system, a recipient's monthly grant is calculated according to his or her assessed need and reported income in the "budget month"—the second month preceding the "payment month." (See EAS, § 44-315.61.)[2]

In determining a family's need for financial assistance, the federal statute requires the states to consider income and resources other than AFDC payments which are available to the needy child or relative claiming aid. (42

---

[2]The OBRA requires all states to use retrospective budgeting for purposes of calculating the amount of assistance payments after the initial one or two months of eligibility. (42 U.S.C. § 602(a)(13); 45 C.F.R. § 233.31 et seq.)

U.S.C. § 602(a)(7).) Where "earned income" is considered, the Act requires that certain work-related expenses be disregarded (42 U.S.C. § 602(a)(8)) so that recipients are not penalized financially when they become partially self-supporting through employment. The Act further requires states to disregard specified portions of the remaining earned income in order to provide a reward and an incentive for recipients to work. (42 U.S.C. § 602(a)(8).)

In addition to the amounts which the states are required to disregard from earned income, the states may permit applicants and recipients to "reserve" specified amounts and types of property, including cash, while receiving assistance. (42 U.S.C. § 602(a)(7)(B); 45 C.F.R. § 233.20(a)(3)(B).) Reserves or "resources" consist of property already in possession of the recipient or that which is accumulated by saving earned income or assistance payments. (See 45 C.F.R. § 233.20(a)(6)(viii).)[3] The essential difference between items characterized as income and those considered "resources" is that any nonexempt income is deducted from the standard of need when determining eligibility and the amount of assistance payments, while resources may be retained without affecting the amount of the assistance provided. If a family's resources exceed the maximum amount permitted, the family is ineligible for assistance altogether. (42 U.S.C. § 602(a)(7); 45 C.F.R. § 233.20(a)(3)(i)-(ii); see Welf. & Inst. Code, §§ 11155, 11257.)

### III

In spite of the apparent importance of the distinction between income and resources to recipients and to program administrators, neither Congress nor the California Legislature has deemed it appropriate to define the terms. Defendant claims that this void confers upon state administrators broad discretion to determine whether items such as tax refunds will be characterized as income or as resources. Defendant acknowledges that the department's policy prior to 1971 was to consider refunds as resources (see *County of Alameda* v. *Carleson, supra,* 5 Cal.3d 730). But defendant argues that the decision to change that policy was one within the discretion vested in the department to administer the program and promulgate regulations "not in conflict with the law." (See Welf. & Inst. Code, §§ 10600, 10604.) Moreover, defendant asserts that under the terms of the OBRA of 1981, federal law now requires that tax refunds be treated as lump sum income. (See 42 U.S.C. § 602(a)(17).) We disagree.

---

[3]Current federal law allows a family to retain resources with a combined equity value of less than $1,000, plus the home it owns and occupies, plus an automobile with equity value of less than $1,500, plus essential household and personal goods. A state may specify lower limits on resources. (42 U.S.C. § 602(a)(7)(B); 45 C.F.R. § 233.20(a)(3)(i)(B).) California permits recipients to retain the maximum resources permitted by federal law. (Welf. & Inst. Code, §§ 11155, 11257.)

Rather, we find persuasive plaintiffs' argument that treating tax refunds as resources is the policy which most reasonably comports with the terms and purposes of the federal statute and regulations. Those provisions indicate that only monies which are regularly and actually available to meet the current needs of AFDC recipients may be considered income to recipient families. Treating tax refunds as resources has the additional salutary effects of providing an incentive for employment and promoting administrative efficiency. We find that defendant's regulation is incompatible with these basic purposes of the program and is therefore void. (See, *Cooper* v. *Swoap* (1974) 11 Cal.3d 856 [115 Cal.Rptr. 1, 524 P.2d 97]; *California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445, 458 [93 Cal.Rptr. 758, 482 670].)

The Act authorizes appropriations for AFDC "[f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives . . . to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." (42 U.S.C. § 601.) Providing economic security requires a steady source of income from which to meet the recipient's recurring basic needs. Thus, monthly payments must be provided with reasonable promptness to all individuals who meet eligibility requirements. (42 U.S.C. § 602(a)(10).) ■ Termination of these benefits must be preceded by adequate notice and an opportunity for the recipient to challenge the proposed action. (*Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011].)

■ In determining need "there is no question that regular and actual contributions to a needy child . . . can be taken into account . . . ." (*King* v. *Smith, supra*, 392 U.S. 309, 319 [20 L.Ed.2d 1118, 1127]. The United States Supreme Court has said that federal administrative regulations which restrict resources to be taken into account to those " 'that are, in fact available to an applicant or recipient for current use on a regular basis. . . .' " clearly comport with the statute. (*Id.*, at p. 319, fn. 16 [20 L.Ed.2d at p. 1127]; *Lewis* v. *Martin* (1970) 397 U.S. 552, 555 [25 L.Ed.2d 561, 565, 90 S.Ct. 1282].)

The courts have uniformly and repeatedly protected recipients from false assumptions that money the states believe should be available to meet living expenses is in fact actually available for such use. (*King* v. *Smith, supra*, 392 U.S. 309 [state regulation denying benefits to children of woman cohabiting with a man regardless of whether he was obligated to or did in fact contribute to their support invalid]; *Lewis* v. *Martin, supra*, 397 U.S. 552 [upholding Department of Health, Education and Welfare regulation pro-

viding that income from nonadoptive stepfather or other person without legal obligation of support may not be presumed available]; *Van Lare* v. *Hurley* (1974) 421 U.S. 338 [44 L.Ed.2d 208, 95 S.Ct. 1741] [state statute denying benefits to children of woman permitting lodger to stay with family regardless of whether he actually contributed to their support invalid]; *North Coast Coalition* v. *Woods* (1980) 110 Cal.App.3d 800 [168 Cal.Rptr. 95] [regulation assuming contribution of unmarried adult male reduced needs of household by set amount invalid].)

■ Cases which have specifically addressed the problem of classifying income tax refunds as income or resources have relied on a federal regulation which limited monies that could be deemed income to "only such net income as is actually available for current use on a regular basis . . . ." (45 C.F.R. § 233.20(a)(93)(ii)(c) (1973); 45 C.F.R. § 233.90 (1979).) In *Kaisa* v. *Chang* (D. Hawaii 1975) 396 F.Supp. 375, a federal district court decided that the language "on a regular basis" had a meaning distinct from the requirement that income be "actually available." "Given the uncertainty of receiving any tax refund and the fact that even if received, it can be expected, at most, once annually, . . ." the court found such refunds could not be deemed available on a regular basis and hence were not income for AFDC purposes. (396 F.Supp. at pp. 377-378.) In *Anderson* v. *Morris* (1976) 87 Wn.2d 706 [558 P.2d 155], the Washington State Supreme Court also found that "a tax refund is not 'regular' in the ordinary sense of the word" and hence was not to be considered income. (558 P.2d at p. 158.)[4]

In *County of Alameda* v. *Carleson, supra,* 5 Cal.3d 730, appeal dismissed (1972) 406 U.S. 913 [32 L.Ed.2d 112, 92 S.Ct. 1762] we held that the department's policy of excluding involuntary payroll deductions from income was proper since "only *net* income available for current use on a regular basis should be considered. . . . (45 C.F.R., § 233.20, subd. (a)(3)(ii)(c)." We further approved the department's then applicable policy of treating such monies as resources when refunded, finding the distinction between recurring and nonrecurring lump-sum payments consistent with the "regular basis" language of the federal regulations. (5 Cal.3d at p. 749.)

Current administrative regulations recognize that a steady and dependable level of income is crucial to providing adequate care of children which is

---

[4]Even the cases finding refunds to be income have relied on this regulatory language. Both *Steere* v. *State Dept. of Public Welfare* (1976) 308 Minn. 30 [243 N.W.2d 112] and *Walker* v. *Juras* (1974) 16 Ore.App.295 [518 P.2d 663] hold that tax refunds are a reasonably predictable annual source of income which may be deemed to be available on a regular basis. Both cases note that refunds may be distinguished from other kinds of lump-sum payments, such as inheritances, gifts, insurance benefits, in that the refunds are attributable to the efforts of the recipient.

the paramount goal of AFDC. For instance, the regulations provide that "net income available for current use and currently available resources shall be considered . . ." in determining levels of assistance. (45 C.F.R. § 233.20(a)(3)(ii)(D).) The regulations permit the states to prorate income which is received in a lump sum pursuant to an employment contract, or which is received intermittently (e.g., quarterly or annually) over the period which the income covers. (45 C.F.R. § 233.20(a)(3)(iii).) The statutory and regulatory provisions which permit an agency to "recoup" excess assistance payments underscore a congressional awareness of the fundamental importance of a consistently and currently available level of financial resources. Where an agency seeks to recover money by reducing the grant to an individual who is a current recipient of aid, the reduction may not leave the recipient's family with liquid resources and income which are less than 90 percent of the amount the agency customarily pays to a family of like size and composition. (42 U.S.C. § 602(a)(22); 45 C.F.R. § 233.20(a)(13)(A)(2).)

With regard to public assistance rendered under the federal food stamp program, Congress has enacted legislation specifying that income tax refunds are to be treated as resources. Subdivision (d) of section 2014 of title 7 of the United States Code excludes 12 types of payments from the computation of household income. Among the excluded items are "moneys received in the form of nonrecurring lump-sum payments, including but not limited to, income tax refunds, rebates, or credits. . . . *Provided,* that such payments shall be counted as resources, unless specifically excluded by other laws, . . ." (7 U.S.C. § 2014(d)(8).)

The report of the House Committee on Agriculture which recommended adoption of subdivision (d) as part of the Food and Agriculture Act of 1977 (Pub. L. No. 95-113) is instructive of the policy considerations underlying this congressional decision. "Counting these payments as income rather than as assets would create serious administrative problems. Food stamp offices would have to recompute the eligibility and benefit levels of tens of thousands of households in the month that tax refunds arrive, then return eligibility and benefits to their original level the following month. Then this whole cumbersome procedure would have to be repeated all over again if a state tax refund arrived in a different month from the Federal tax refund. [¶] All of this paperwork makes especially little sense since the amounts of money involved in tax refunds that food stamp recipients might get, or in such things as birthday presents, are small." (House Rep., No. 95-464, reprinted in 1977 U.S. Code Cong. & Admin. News, p. 2014.)

We agree with the Federal District Court for Hawaii and with the Supreme Court of Washington that income tax refunds cannot be considered

regularly received within the meaning of the laws governing AFDC. (*Kaisa* v. *Chang, supra,* 396 F.Supp. 375; *Anderson* v. *Morris, supra,* 558 P.2d 155.) Refunds are made and received but once each year. Only the small number of recipients whose withholdings exceed their tax liability may receive refunds. Further, as plaintiffs assert, refunds are rarely a recurring source of funds for AFDC recipients because so few receive them in any given year and because the average duration of a family's receipt of AFDC is only approximately two years. Thus, these funds are not consistently available to meet continuing needs.

The fact that specific regulatory language relied on in prior cases does not appear in the 1982 version of the regulations implementing AFDC does not change the import of the overall scheme enacted by the legislative body. The scheme clearly seeks to insure that needy children will be provided with a minimally adequate level of care and support. This purpose can only be achieved if items classified as income, which directly reduce an AFDC grant, are limited to those which are received on a sufficiently regular basis that they may be depended upon to meet the recipients' continuing basic needs.

We note that it is the nature of tax refunds when they are *received,* rather than the nature of the monies from which they have been derived which is relevant to a recipient's ability to meet his or her daily needs. To the recipient, the lump sum payment that arrives in the spring might be said to resemble a savings account which the government has forced him or her to establish. The sum refunded is like a reserve which has been accumulated from earnings. According to federal regulations, such reserves should be treated like any other resource. (See 45 C.F.R. § 233.20 (a)(6)(viii).)

Contrary to defendant's assertion, treating tax refunds as resources rather than income will not result in unwarranted windfalls allowing persons with substantial financial resources to remain on the public welfare rolls. The amounts of money involved are relatively small; as noted, defendant's own estimate was that the average refund received by an AFDC recipient for the year 1976 would amount to merely $130.[5] Both state and federal statutes render a family ineligible for public assistance if the value of its resources exceeds $1,000. (42 U.S.C. § 602(a)(7); Welf. & Inst. Code, § 11257.)

The department defends the regulation in effect in 1979 on the theory that under the then current federal law it was free to designate tax refunds as

[5]While this amount is inconsequential when considered in relation to the amount required to sustain a needy family over any significant period of time, it is large indeed when deducted from a single month's assistance grant.

either income or resources to AFDC recipients.[6] The department claims that neither this court's opinion in *County of Alameda* v. *Carleson, supra,* 5 Cal.3d 730, nor the "regular basis" language then included in the federal regulations controlled its administrative decision.

In *Carleson, supra,* 5 Cal.3d 730, this court was presented with a suit by several California counties seeking to force the Director of the Department of Social Welfare (now the Department of Social Services) to adopt policies pertaining to the disregard of earned income and the deduction of work-related expenses which would be less generous to welfare recipients. At the time the department permitted the exclusion from income of involuntary deductions such as income tax withholdings, while considering tax refunds as resources when they were received. The policy was based on the distinction of nonrecurring lump sum payments, considered property or resources, from recurring ones, considered income. (Former EAS § 41.309; see Welf. & Inst. Code, § 11157.) This court approved the department's policy, finding both exclusions from income comported fully with the federal requirement that only net income available for current use on a regular basis could be considered. (5 Cal.3d 730, 749.)

In order to uphold the department's policy of treating tax refunds as resources, the *Carleson* court needed only to find the regulation was consistent with federal law. The court was not required to squarely hold that federal law *required* that treatment. Nevertheless, prior decisions of this court indicate the department bears the burden of showing that its abrupt reversal of policy in the wake of explicit judicial approval[7] executed an expressed legislative intent and resulted in a policy consistent with federal law. The department has shown neither. In *Cooper* v. *Swoap* (1974) 11 Cal.3d 856 [115 Cal.Rptr. 1, 524 P.2d 97], this court invalidated a regulation by which the department deemed savings occasioned by shared housing to be income for AFDC purposes. The court observed that the regulation represented a "radical departure" from prior practice. Had the Legislature intended such a change, it surely would have clearly expressed that intent in the provisions of the Welfare Reform Act of 1971. "Otherwise we must conclude that the Legislature, familiar with the long-standing administrative interpretation of income, manifested its approval by leaving the income provision of section

---

[6]In support defendant urges us to accept the 1980 declaration of the assistant regional commissioner of the Social Security Administration as a contemporaneous administrative interpretation of the law which is entitled to great deference. We note, however, that there is no indication that this interpretation is contemporaneous with the statutory provision it purports to interpret. Neither has the Department of Health and Human Services (formerly Health, Education and Welfare) chosen to address the treatment of tax refunds officially by promulgating published regulations.

[7]The new policy was apparently instituted just after the *Carleson* decision was reached.

11008 unchanged." (11 Cal.3d at p. 868.) In *California Welfare Rights Organization* v. *Carleson, supra,* 4 Cal.3d 445, this court held invalid a departmental attempt to effect a fundamental change in the method of calculating the level of AFDC benefits where the Legislature had not clearly expressed an intent to make the change. (4 Cal.3d at p. 458.) Under the analysis of these cases it falls to the department to demonstrate either a legislative intent to change the treatment of income tax refunds or that such a change is required by federal law and does not contravene controlling California statutes.

The department, however, offers little by the way of reasons for the 1971 change in policy. It argues that income tax refunds are regularly received ·by employed recipients on an annual basis. We have already indicated that we do not believe this is the kind of regularity of income contemplated by the AFDC statutes. The department then argues that regularity of receipt is not required by the particular regulation relied on by plaintiffs (45 C.F.R. § 233.90 (1979)) because that regulation concerned the attribution of income from a substitute father, or unmarried man living in an AFDC household. This, however, is beside the point. The regulation cited in *Carleson* (45 C.F.R. § 233.20(a)(3)(ii)(c)) clearly did pertain to the computation of income generally. The department complains that the *Carleson* court merely assumed, erroneously, that income tax refunds were akin to nonrecurring lump sum social insurance payments which the California Legislature has designated as resources rather than income pursuant to Welfare and Institutions Code section 11157. The *Carleson* court did not, however, rely on section 11157; rather it upheld then existing departmental regulation EAS section 41-309 on the basis of its consistency with controlling federal law.

Section 11157 of the Welfare and Institutions Code does not define either income or lump sum income. It merely provides that income which happens to be received in a lump will be considered income in the month received. The statute excludes "nonrecurring lump-sum social insurance payments, which . . . shall include but are not limited to social security income, railroad retirement benefits, veteran's benefits, workman's compensation, and disability insurance." Paragraph two of the statute further provides that to the extent required by federal law "lump-sum payments of income, as defined by federal law, shall be considered income in the month received. . . ."

This provision of our state statute is similar in effect to the lump-sum income provision added to the federal Act by the Omnibus Budget Reconciliation Act of 1981. Defendant claims this new federal statute requires the department to consider income tax refunds as income to AFDC recipients

and hence supports repromulgation of a departmental regulation to that effect.

Subdivision (a)(17) of 42 United States Code section 602 provides that "if a person . . . receives in any month an amount of income which, together with all other income for that month not excluded under paragraph (8), exceeds the State's standard of need . . ." the income will render the family ineligible for assistance for the "whole number of months that equals (i) the sum of such amount and all other income received in such month . . ., divided by (ii) the standard of need applicable to such family . . . ."

The section does not purport to define "income." In fact, the report of the Senate Budget Committee states that the amended section will have the effect of counting "any payments that meet the definition of income—for example, retroactive social security benefits—" as income in the month of receipt and thereafter until the payments have been exhausted according to the established standard of need. (Sen. Rep. No. 97-139, reprinted in 1981 U.S. Code Cong. & Admin. News, at p. 771.) Thus it seems that the section was intended to apply to payments of money that would ordinarily be received in the form of regular, recurring income—such as social security benefits—but which for some reason—such as the delay inherent in processing initial claims—is received in a lump. Income tax refunds do not fit into this category. Defendant's argument that the OBRA requires him to consider tax refunds as lump sum income is not supported by the statute upon which he relies.

We believe that treating such occasional monies as tax refunds as resources rather than income is consistent with another expressed legislative concern: that the AFDC program be administered in the most efficient and effective manner possible. As noted above in relation to the food stamp program, the tax refunds of persons eligible for AFDC are generally quite modest. Thus, the paperwork required to adjust monthly grants of every family receiving a tax refund either two or four times per year (depending on whether state and federal refunds arrive in the same month) is likely to be disproportionate to the fiscal savings the program may expect to realize. At the same time, as the plaintiffs here demonstrate, the hardship worked on individual families is considerable.[8]

---

[8]One further argument is implicit in defendant's position: that *all* monies received by AFDC recipients in a given month should be considered income for AFDC purposes. However, defendant's own regulations show that this cannot be the basis for the treatment of income tax refunds. EAS section 44-111.44 excludes from consideration as income the first $60 each quarter of the year which is received infrequently or irregularly. EAS section 44-101.4 gives as examples of such income: "Income from occasional labor . . . which offer no security as a regular source of maintenance; . . . the value of the usual small gifts in cash or in kind given in commemoration of holidays and anniversaries; . . . interest on

For all the reasons set forth above, we conclude that defendant's regulation which considers income tax refunds as income to AFDC recipients in the month the refunds are received fails to comport with the language and purposes of the applicable federal statutes and regulations. We hold that an appropriate regulation is one which considers irregularly received monies like tax refunds to be resources to the recipient household. We believe that not only does this holding further the fundamental statutory purpose of providing economic stability and security to families with dependent children who are in need of and eligible for governmental assistance, but in the long run it also will further the legislative desire that California's public assistance system function in the most efficient and effective manner.

The order of the Los Angeles Superior Court granting preliminary injunctive relief in *Vaessen* v. *Woods* is affirmed. Let writ of mandate issue compelling the court to enter a further injunction as prayed by plaintiffs and petitioners in *Vaessen* v. *Superior Court*. The matter is remanded for further proceedings consistent with the views we have expressed.

Bird, C. J., Mosk, J., and Broussard, J., concurred.

**RICHARDSON, J.**\*—I respectfully dissent.

Our function is to assure that the policy adopted by the California Department of Social Services (DSS) is "not in conflict with the law" as contained in the applicable statutes and regulations. (Welf. & Inst. Code, §§ 10600, 10604; cf. *Allen* v. *Bergland* (4th Cir. 1981) 661 F.2d 1001, 1005 ["the relevant inquiry is whether the department's interpretation is *inconsistent* with the regulations and not whether some other interpretation is consistent with those same regulations"].) I conclude that the state's treatment of income tax refunds is in compliance with federal requirements. The necessary analysis should begin with an acknowledgment that 42 United States Code section 602(a)(8) requires that the states "take into consideration any other income or resources of any child or relative claiming aid to families with dependent children" except as otherwise specifically required.

Two years ago, Congress enacted the Omnibus Budget Reconciliation Act of 1981 (OBRA). The federal regulations promulgated pursuant to OBRA are relevant to the issue before us. They require that in determining financial eligibility for, and the amount of, assistance payments "Net income avail-

---

securities which has no appreciable significance in meeting continuing needs. . . ." Defendant offers no reason why tax refunds—if they were income—should be treated differently from other irregularly received monies.

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

able for current use and currently available resources shall be considered; income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance." (45 C.F.R. § 233.20(a)(3)(ii)(D).) "Earned income" includes "income in cash or in kind earned by a needy individual through the receipt of wages, salary, [and] commissions . . . ." (*Id.*, (a)(6)(iii).) Such "earned income" is comprised of the total amount of wages, salary, and commissions "irrespective of personal expenses, such as income-tax deductions, lunches, and transportation to and from work . . . ." (*Id.*, (a)(6)(iv).)

The federal regulations further provide for specific "disregards" of income for work related expenses, child care and a percentage of the earned income. Although no provision specifically permits disregarding income tax deductions at the time they are withheld, there is authority that "the Congressional purposes underlying the AFDC statutes indicate that the Social Security Act requires subtraction from gross income of mandatory payroll deductions *in addition to* subtraction of $75.00 per month 'work expenses' disregard." (Italics in original, *Turner* v. *Woods* (N.D.Cal. 1982) 559 F.Supp. 603, 615, affd. (9th Cir. 1983) 707 F.2d 1109, cert. granted *sub nom. Heckler* v. *Turner* (1984) — U.S. — [79 L.Ed.2d 739, 104 S.Ct. 1412].) In so deciding, the district court relied upon a long line of cases holding that Congress intended to encourage work and that this purpose was best served by "limiting the amount of 'income' counted against a recipient to funds that are *actually and currently available.*" (Italics added, *ibid.*) Because amounts withheld for taxes are not so available, they may not be considered as income. However, when such withheld amounts are returned to the taxpayer in the form of refunds, their status changes and they become "available" and must be treated as income.

Previous federal regulations required state plans to provide that "In establishing financial eligibility and the amount of the assistance payment, only such net income as is actually available for current use *on a regular basis* will be considered . . . ." (Italics added, former 45 C.F.R. § 233.90(a)(1).) The foregoing language requiring receipt "on a regular basis" has been expressly deleted from the regulations. In my view, this deletion has interpretive significance. Nonetheless, my colleagues continue to rely on cases which construed the earlier, now inapplicable requirement. In *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 749 [97 Cal.Rptr. 385, 488 P.2d 953], *Kaisa* v. *Chang* (D. Hawaii (1975) 396 F.Supp. 375, 377, and *Anderson* v. *Morris* (1976) 87 Wn.2d 706 [558 P.2d 155, 158-159], each court relied upon the "regular basis" terminology in concluding that tax refunds could not be considered as income under the then applicable regulations. For example, the *Kaisa* court reviewed the argument that in

considering eligibility and the amount of assistance payments due, "income must meet all three requirements: (1) actually available; (2) for current use; and (3) on a regular basis." The court concluded that "Since a tax refund can be expected, at best, once a year, it is not available on a regular basis and, *therefore,* cannot be considered as income." (Italics added, 396 F.Supp. at p. 377, fn. omitted.)

The deletion of the requirement that income be available "on a regular basis" appears related to the broader change effected by Congress through OBRA in the treatment of lump-sum payments in general. Formerly, such payments were considered as income in the month received and as resources thereafter. The practical effect of this treatment was that once a sum was regarded as a resource, to the extent that it did not exceed applicable limits on the amount of resources, it was ignored in computing either eligibility or the amount of a grant.

The current version of section 602(a)(17)(A) of title 42 of the United States Code provides that if a recipient in a particular month receives income which exceeds the applicable standard of need, the family will be ineligible "for the whole number of months that equals (i) the sum of such amount and all other income received in such month, . . . divided by (ii) the standard of need applicable to such family . . . ." Any balance of such income which is less than the applicable monthly standard is treated as income received in the following month. This is significant fiscal tightening.

Income tax refunds are employment-generated sums withheld in the expectation of a certain tax liability, which are then returned to the taxpayer if the actual tax liability is less than anticipated. Such sums must be classified as "net income" because they are "income . . . earned . . . through the receipt of wages, salary, [and] commissions . . ." and are not subject to any of the permissible "disregards" of income. (45 C.F.R. § 233.20 (a)(11)(i).)

This conclusion is bolstered by an examination of the statutory treatment of tax refunds and credits in related portions of the federal codes. For example, sections 43 and 3507 of title 26 of the United States Code provide that specified low-income individuals may be permitted "earned income credits," which are tax credits against income taxes which are otherwise imposed. The credits are in an amount equal to 10 percent of earned income not in excess of $5,000. Under 26 United States Code section 3507, an employer is required to pay an employee an additional sum if the employee has filed an eligibility certificate for an earned income credit. For tax purposes, these payments are not treated as additional compensation and their source is sums which normally would be withheld by the employer as pay-

roll deductions for taxes and FICA. Thus, depending on whether or not the employee has filed a certificate with his or her employer, earned income credits will be received either as an additional amount in the employee's paycheck, or when income taxes are due and a refund is made.

In 1980, Congress mandated that *"any refund of Federal income taxes made by reason of section 43 . . . [or] 3507 of Title 26 . . . shall be considered earned income"* to be taken into consideration in determining need. (Italics added, former 42 U.S.C. § 602(d).) As amended in OBRA, the statute now provides that "an individual's 'income' shall also include . . . an amount (which shall be treated as earned income for purposes of this part)" which is equal to the earned income credit advance to which he or she would be entitled, whether or not a certificate has actually been filed with the employer. (42 U.S.C. § 602(d)(1); 45 C.F.R., § 233.20(a)(6)(ix).) The apparent reason for this change was to encourage "an increased number of AFDC recipients [to] file for an advanced [earned income credit]." (Dept. of Health and Human Services, Social Security Administration, Coms. to Final Regs., 47 Fed.Reg. 5648, 5660 (Feb. 5, 1982).)

The effect of the foregoing is that Congress has considered earned income credits as refunds or credits of otherwise due taxes which *must be counted as income for purposes of AFDC.* Although careful to avoid double counting of such sums when they are deemed received in a paycheck and when they are actually received in a lump sum (47 Fed.Reg., *supra,* at pp. 5660-5661), the clear congressional intention is that such refunds of taxes are not to be ignored in determining eligibility or the amount of assistance to which AFDC recipients are entitled.

Congressional treatment of income tax refunds afforded under the Food Stamp Program is also illuminating. Section 2014(d) of title 7 of the United States Code in determining food stamp eligibility specifically excludes from income "moneys received in the form of nonrecurring lump-sum payments, *including,* but not limited to, *income tax refunds* . . . ." (Italics added.) In the food stamp sector, Congress expressly eliminated income tax refunds from the definition of income. It has not similarly excluded such sums in the area of AFDC benefits. I think that therein lies a revealing lesson— Congress clearly could have provided analogous treatment had it so intended. It did not do so.

My colleagues rely on *King* v. *Smith* (1968) 392 U.S. 309 [20 L.Ed.2d 1118, 88 S.Ct. 2128] and *Lewis* v. *Martin* (1970) 397 U.S. 552 [25 L.Ed.2d 561, 90 S.Ct. 1282] (see *ante,* pp. 757-758). However, these cases are of dubious analytical value, for each involved the invalidation of regulations

which improperly *assumed* the availability to the recipient of income. In our case, the moneys are in the hands of the recipients; availability is simply not in issue.

In my view, the Internal Revenue Service (IRS) will be surprised to learn that tax refunds are "forced" savings accounts as described by the majority. (*Ante,* p. 760.) Such refunds have few of the attributes of a "savings account." They may not be withdrawn at will and do not accrue interest. The IRS requires that refunds of state taxes be reported as *income* in the year of receipt, further demonstrating that such funds bear little resemblance to money placed in a savings account. More importantly, however, under the majority's analysis, the DSS is not permitted to count amounts withheld as "earned income" either when they are deducted or when they are refunded. The effect of this reasoning is that such funds will escape entirely the requirement that income be considered in determining eligibility and the amount of assistance to which a recipient is entitled, all of which is contrary to the clear mandate of 42 United States Code section 602(a)(8) cited above.

Nor does the majority's reliance on *Carleson, supra,* 5 Cal.3d 730, survive scrutiny. We held there that "the [applicable] HEW [Department of Health, Education and Welfare] regulation . . . *permits* the state to consider as income only those funds received 'on a regular basis.' Consequently, California's distinction between recurring and nonrecurring payments comports fully with the federal requirements." (Italics added, *id.,* at p. 749.) As the majority notes, "the *Carleson* court needed only to find that the regulation was consistent with federal law." (*Ante,* p. 761.) From this premise, that the approach adopted in California was consistent with the governing federal statutory and regulatory scheme, the majority now argues that the DSS, when it changed its policy after our decision in *Carleson,* was required to show that "its abrupt reversal of policy in the wake of explicit judicial approval executed an expressed legislative intent and resulted in a policy consistent with federal law." (*Ante,* p. 761, italics added, fn. omitted.) Thus, the majority has transformed a requirement of consistency to a requirement that the department show, in addition, "an expressed legislative intent" before it may adopt a new approach and new regulations. The practical effect of this holding is to restrict an agency to its initial approach, despite the fact that its choice was one among several acceptable methods of implementing a statutory scheme, unless the Legislature expressly approves an alternative approach.

My colleagues' reliance on *Cooper* v. *Swoap* (1974) 11 Cal.3d 856 [115 Cal.Rptr. 1, 524 P.2d 97], and *California Welfare Rights Organization* v. *Carleson* (1971) 4 Cal.3d 445 [93 Cal.Rptr. 758, 482 P.2d 670], in support of this novel requirement is misplaced. In each of those cases, we held that

state regulations were *in conflict* with the statutory provisions which they were designed to implement, not that the regulations failed for lack of a newly expressed legislative intent approving a shift from one consistent approach to another equally consistent approach. Thus, in *Cooper,* we found that new regulations regarding treatment of noncash benefits as income were inconsistent with express legislative history, incompatible with the general "flat grant" approach utilized under the state plan, and *explicitly precluded* by applicable statutory provisions. Similarly, in *California Welfare Rights Organization* we found that new state regulations imposed following a federal court ruling that the state scheme did not comport with federal requirements were in part invalid because the regulations were neither necessary for conformity with federal requirements *nor authorized by statute.*

The majority somehow transforms these holdings that the regulations at issue were *incompatible* with federal or state law into a new requirement that a new regulation follow only after a new expression of legislative intent. There is no such requirement in law, statutory or decisional, so far as I am aware. *Any* regulation which comports with the existing underlying legislative scheme is permissible; no additional legislative approval is needed. Such regulation should clearly be afforded the great weight which we normally give to the interpretations of a statute by the administrative agency which is empowered to promulgate applicable regulations. (See, e.g., *Judson Steel Corp.* v. *Workers Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668 [150 Cal.Rptr. 250, 586 P.2d 564].)

Nor does the majority point to an actual incompatability here. Instead, it ignores fundamental rules of statutory construction in attempting to reconcile its conclusion with the governing state and statutory schemes. I note only a few instances of the convoluted paths of reason which my colleagues are thereby forced to tread. First, and most obviously, as noted my colleagues fail to give any effect to the federal regulatory action in response to the passage of OBRA in specifically deleting the requirement of regularity. This alteration took place after several courts had expressly relied on that requirement in concluding that income tax refunds were not to be counted as income. Despite this excision, the majority continues to "intuit" a federal intention to require regularity.

The United States Senate Report regarding the altered treatment of lump sums in OBRA is also instructive. The majority cites language in the report which gives as an example of a lump sum payment retroactive social security benefits. (*Ante,* p. 763.) From this, it concludes that only money "ordinarily" received on a regular and recurring basis will comprise the lump sum of which Congress speaks. However, the report expressly states that "The committee believes that *lump-sum payments should be considered*

*available* to meet the ongoing needs of an AFDC family . . . *any amount of the income* that exceeds the initial month's needs standards would be divided by the monthly needs standard, and the family would be ineligible for aid for the number of months resulting from that calculation." (Sen. Rep. No. 97-139, reprinted in 1981 Code Cong. & Admin. News at p. 771, italics added.) Instead of relying on the express and unqualified statement of intent regarding the treatment of "lump sum payments," the majority seizes upon a reference to one possible source of such funds and there discerns an unspoken legislative intent.

Similarly, the majority's reliance on the State Department of Social Services, Eligibility and Assistance Standards Manual, section 44-111.44 is misplaced. The section expressly excludes certain irregularly received income from consideration as income for purposes of computing AFDC, indicating that "but for" the stated exemptions, such irregular income must be considered. (See *ante,* p. 763, fn. 8.) Ignoring the application of the basic rule of statutory interpretation, *inclusio unius est exclusio alterius,* the majority instead reads in an exception for the unmentioned tax refunds.

In summary, in order to find a conflict, the majority must reject a straightforward reading of the applicable statutes and instead intuitively glean congressional and administrative intent from selected portions of the applicable statutes and regulations. The conflict is, I submit, a manufactured one.

Justice Potter Stewart wisely cautioned 14 years ago: "Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure . . . . But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration [citation] . . . But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. [Citations.]" (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 487 [25 L.Ed.2d 491, 503, 90 S.Ct. 1153].) In similar fashion, our role is not to articulate policy, but to determine whether the challenged state regulations are permitted by federal law.

The injunction from which the director appeals may well have been proper when issued. Inasmuch as an injunction operates in futuro, however, its validity on appeal must be determined as of the date of the appellate decision. (*Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 323 [158 Cal.Rptr. 370, 599 P.2d 676].) OBRA and an amendment to 45 Code of Federal Regulations section

233.90(a)(1) have intervened. I would, therefore, reverse the injunction and deny the petition for writ of mandate.

Kaus, J., and Grodin, J., concurred.